## KINSELA'S ADMINISTRATOR *vs.* THE CATARACT CITY BANK.

Where "seven (or more) citizens of this state" associated to establish an office of discount, deposit, and circulation, under the act to authorize the business of banking, approved February 27th, 1850, and executed, acknowledged, and had recorded in the offices of the secretary of state, and the clerk of the county where said office was proposed to be located, the certificate required by the sixteenth section of the act, which certificate also states that the associates had elected one of their number to be president of the association, and the association went into operation without further organization, except the selection of a cashier, it was *held*—

1. That the persons signing said certificate were only associates, and corporators or stockholders, and not directors or managers of said corporation; the eighteenth section giving to them only power "to choose a board of directors," under whose "direction" the business of banking may be conducted.

2. That the transaction of banking business by said associates, or by the president alone, whom they had selected, was a fraud on the statute.

3. Where seven of the associates subscribed for only five shares each, and the balance of the three thousand shares was subscribed for by the eighth associate, who was also the president elect, and one third on each share of the whole stock was paid in by the president, the other associates paying nothing, it was held to be a valid corporation, and each and all the associates responsible for its proceedings.

4. That each of said associates was liable, in case of insolvency, to pay the deficiency on the stock standing in his name, not exceeding the amount of each share as fixed by the charter, or such proportion as shall be re-

Kinsela's Administrator v. The Cataract City Bank.

quired to satisfy the debts of the company, and that a court of equity will enforce such payment.

5. Under the second section of the act to prevent frauds by incorporated companies, approved April 15th, 1846, it was held, in order to evade a sale or transfer by an insolvent corporation or its officers, it must appear that the corporation had, previously to such sale or transfer, become insolvent, or suspended its ordinary business for want of funds.

6. Under the proviso to said section, a transfer of notes or property of the bank, prior to suspension, for a valuable consideration, to a *bona fide* purchaser, without "knowledge, information, or notice of the insolvency," was held to be good and valid.

7. The "knowledge, information, and notice of the insolvency" cannot depend on mere constructive notice, or what will put the party on inquiry only. The terms of the act imply knowledge, either of the party himself or imparted to him by some one who had that knowledge, and not mere suspicion, supposition, or belief of himself or of another, imparted to him.

8. An associate who took no part in the transactions of the bank after he had signed the certificate, was not in a situation to be charged with implied knowledge or notice as a director or manager.

9. Where a sum of money was placed in the bank as a special deposit to meet a contingency of the bank which never happened, the repayment of the same by the receiver was held valid.

10. The removal of the receiver was refused.

11. Several payments were made by the bank, but whether before or after suspension, did not clearly appear; in these cases the receiver was directed to deal with them in accordance with the principles stated in the opinion.

This cause was argued before the Hon. J. F. Randolph, master, sitting for the Chancellor, upon exceptions by certain creditors of the Cataract City Bank, to the report of the receiver. The facts of the case fully appear in the opinion of the master.

*Mr. Woodruff*, for the creditors, excepted to the report upon the following grounds:

1. That the receiver's account is not sworn to. *Edwards on Rec.* 616, 632; 1 *Smith's Ch. Pr.* 643.

2. That it is not brought down to the time of accounting. *Edwards on Rec.* 615, 616, 617.

3. That the safe and articles undisposed of, are not men-

tioned. The receiver's account should show the state of affairs; what is on hand in property, as well as in cash. *Edwards on Rec.* 615 to 622, inclusive.

4. That the receiver has not charged himself with the amount of his own subscription to the stock—five shares, at $50—$250.

This he was bound to do. His excuse for not doing so, that Sanford and he, when he subscribed, agreed that he should never be called on to pay, is no legal excuse. Such an agreement was a fraud, and might be evidence of a conspiracy to defraud.

5. That he has not charged himself with $7005, got by him on December 1st, 1860, at seven o'clock in the morning, the very day the bank failed. He is justly chargeable with this. He admits, in his answer, that the bank was insolvent on November 23d, 1860, and that, on November 24th, 1860, the Mechanics and Traders Bank refused to trust it for $3000.

He admits Sanford offered to *secure* him for his then balance if *he* would lend the bank $3000; that before December 1st, he called three times for collaterals, thus admitting his knowledge that the bank was insolvent; and that, on December 1st, he appropriated the assets, which should have been distributed among the creditors ratably, to his own private benefit, contrary to the statute. *Nix. Dig.* 371, § 2.

His answer, together with his bank book, show that his pretence of good faith is a subterfuge; the items under date of November 23d, 1860, not having been put in his bank book until December 1st, 1860.

The evidence shows that Rafferty knew this bank was insolvent before he got this $7005, and that he got it *because* he knew it was insolvent. This amount should be returned by him for the equal benefit of all the creditors. Mr. Rafferty being one of the original stockholders and managers of this bank, could not, by law, after he knew it was insolvent, appropriate $7005, in notes, &c., to his own use. It was not a transaction "in the ordinary course of business." It was at an unusual hour, seven o'clock in the morning, and in an

unusual manner, not by going in at the front door, but, as he confesses in his answer, by "a side door."

What right has he, after getting the deposits of the industrious mechanic, the orphan, and the widow, to put them thus in his own pocket, so that they shall lose, and he shall not lose?

The evidence shows that Rafferty got these bills receivable, $7005 worth, after the bank was insolvent, and after he *knew* it to be insolvent. They were got stealthily, under circumstances showing conscious guilt. His subsequent acts at A. A. Hopper's, on Sunday night, at Sanford's, on Monday night, and getting appointed receiver, were but adroit efforts to conceal the ill-gotten plunder, and cover up his tracks.

6. The receiver ought to be removed.

A receiver should be an indifferent person. He was not, and is not, such a person. He is interested in keeping over $7000 from the creditors. He is really *a party* in interest. Such a one should not be appointed. *Edwards on Rec.* 2, 4; *Nix. Dig.* 373, § 12.

The receiver's powers are ample to investigate and collect. *Nix. Dig.* 273, § 9. And yet Mr. Rafferty, after having been a receiver three years, has not even collected one dollar from the original stockholders and starters of this bank, of whom he was one.

He is bound to report every six months. *Nix. Dig.* 373, § 11. Yet he has made no report. Why? Because he was afraid to make a true report of the $7005 he obtained after he knew the bank was insolvent.

The act (*Nix. Dig.* 371, § 1 and 2,) declares that neither the president, nor any one else, could legally transfer any property after it was insolvent, except for " *a bona fide purchase*, made for a valuable consideration," before the bank suspended, by a person " having no knowledge, information, or *notice* of the insolvency of said company, or of the sale being made in *contemplation* of insolvency of the said company."

This principle applies even as to partners at common law.

A precedent debt is not such a valuable consideration as

the statute contemplates. 41 *Barb. S. C. R.* 307; 3 *Amer. Law Reg.*, (*new series*,) 637; 1 *Parsons on Con.* 216, *and note j.*

The persons subscribing the stock were the "managers" of the Cataract City Bank. Rafferty was one of these. They were the persons incorporated. *Nix. Dig.* 56, § 17. They were the only directors. No others were ever elected. Sanford was their "agent," under the name of president. His act was their act. What he knew they are presumed to know.

The association thus incorporated are subject to all liabilities mentioned in the "act concerning corporations." *Nix. Dig.* 59, § 41. By this act each stockholder is bound to pay up the whole amount of his stock. *Nix. Dig.* 151, § 5.

A stockholder is presumed to have notice of what is entered on the books of the corporation, to which he has access if he chooses.

Rafferty having taken this $7005 when, by the books, it appeared the bank was insolvent, and when he knew it was so, should be decreed to hold it in trust for all the creditors. *Le Neve* v. *Le Neve,* 2 *White and Tudor's L. C.* 130, 132–3, 144, 149; 4 *Wheaton* 466.

The court has power to remove a receiver who has thus neglected and violated his plain duty, and ought to do so, and compel him to disgorge. *Edwards on Rec.* 4, 660, 667, 668; *Ibid.* 612, 625, 626.

*Mr. Bradley,* for receiver.

THE MASTER.

The bill in this case was filed in December, 1860, against the Cataract City Bank of Paterson, by one of its creditors, alleging the insolvency of the bank and its inability to redeem its notes or pay its debt, and praying for an injunction to restrain the bank, its officers and agents, from transferring or disposing of their property, real and personal, and from receiving debts due to, or paying debts due from, the bank, and also for the appointment of a receiver. The injunction

was ordered, according to the prayer of the bill, and Philip Rafferty was appointed receiver, and qualified, by oath taken before a master, faithfully, honestly, and impartially to execute the powers and trusts reposed in him as receiver, for the creditors and stockholders of the Cataract Bank, without favor or affection.

On the 24th of January, 1861, the receiver filed an inventory of "all the estate, property, and effects of the bank in this state," and "an account of all debts due from said bank and to said bank," as near as the receiver could then ascertain; by which report it appears there was due the bank $112,673.15; of which $93,508.80 were considered "bad," $16,792.43 "very doubtful," $501.81 "doubtful," and $1869.11 "good," and the "liabilities" of the bank were specified and set down at $34,311 54.

On December 16th, 1861, the receiver made and filed his first report, and on the 10th of March, 1864, he made a further report; prior to which last report, viz., February 9th, 1864, Cornelius Van Winkle and other creditors of the bank filed a petition in this court, alleging various errors in the proceeding and accounts of the receiver, and praying for his discharge, and the appointment of another receiver, to which petition there was also filed an answer by the receiver, and a replication by the petitioner was also filed on the 6th of April, 1864. The whole matter contained in the report, petition, answer, and replication, was referred to a master, to state the accounts of the receiver for all moneys and assets which have come to his hand, and which in equity belong to the Cataract City Bank, and are due and payable to the creditors thereof; and that the master inquire and report whether the receiver is justly chargeable with the sum of $7005.40, or any sum for money or assets of the bank received by him about the first of December, 1860; and whether he is chargeable with any sum for stock subscribed to the bank; and that the master inquire and report on the other matters set forth in the aforesaid petition, which may seem material.

The master to whom the matter was referred reported the account of the receiver, showing the sum of $2081.55 as the amount of money received by him from the assets of the bank, and the sum of $833.24 as the amount of money paid out and expended by him, leaving a cash balance in the receiver's hands, of $1248.26. The master also reported the evidence taken by him, for the consideration of the court, without giving an opinion upon any of the questions referred.

To this report of the master, as well as that of the receiver, exceptions were filed. A decree *pro confesso* having been previously taken against the defendants in the bill, the cause was set down for hearing on the petition and answer, the reports of the receiver and master, and exceptions thereto; and the same was argued before the late Chancellor, who failing to determine the cause while in office, and the present Chancellor having been of counsel in the cause, a rehearing was ordered before the master, and counsel both for the petitioner and the receiver having been heard, I will proceed to dispose of such questions as may be deemed material.

The first question raised, grows out of the organization of the bank in 1860, under the act to authorize the business of banking, approved February 27th, 1850. The fifteenth section of the act states that "any number of persons, not less than seven, citizens of this state, may associate to establish offices of discount, deposit, and circulation, on the terms and conditions, and subject to the liabilities, prescribed in this act;" the aggregate of capital not to be less than $50,000. The certificate for the organization of the Cataract City Bank, which was filed in the office of the Secretary of State, and clerk of Passaic county, is in the following form :

Paterson, N. J., October 23d, 1856.

R. M. Smith, esq., State Treasurer—Dear Sir :

We, the undersigned, do hereby associate ourselves together, under the laws of this state to authorize the business of banking, under the name of the Cataract City Bank, and have subscribed for three thousand shares, of fifty dollars each, and shall pay in, on the day of commencement, sixteen

and two thirds dollars upon each share, making the sum of fifty thousand dollars, which we propose to use under said banking law, in the city of Paterson, Passaic county, New Jersey, and to deposit with the State Treasurer fifty thousand dollars of Virginia state bonds, or other stocks, as the law requires, for the same amount of bills, to be registered by him, to commence with; and shall from time to time deposit more securities for a like purpose, as the association may require, until we get the full amount of three thousand shares; said association to continue twenty years from date above.

Five shares to Thomas D. Hoxsey, of Paterson.

Five shares to Benjamin Buckley, of Paterson.

Five shares to P. Rafferty, of Paterson.

Five shares to Nathaniel Lane, of Paterson.

Five shares to Edward G. Ford, of Paterson.

Five shares to Thomas O. Smith, of Paterson.

Five shares to R. B. Chiswell, of Paterson.

Two thousand nine hundred and sixty-five shares to Charles Sanford, of Paterson.

We have also appointed Charles Sanford president of this bank. Any communication you may receive from him, as said president, you will please consider duly authorized.

The foregoing certificate was duly signed by Mr. Sanford and his seven associates, and on the same date was duly acknowledged by them, before William Gledhill, esq., master in chancery, and filed in the office of the Secretary of State, and clerk of Passaic county, as the statute requires.

From the evidence, and the admissions in the case, there is no question that the whole bank really belonged to Charles Sanford, and that he paid the whole of the sixteen and two thirds dollars on each of the three thousand shares of stock, being the first and only instalment paid, and amounting to the sum of $50,000, or one third of the entire capital of the bank which the article of association called for. The certificate not only states the terms of the organization of the

bank, but adds that "we (the eight associates) have also appointed Charles Sanford president of this bank." The making and filing of this certificate made "the said persons so associating" a "body corporate and politic, by the name mentioned in said certificate," according to the seventeenth section; and by the eighteenth section, "every such association shall have power to choose a board of directors, and *under the direction* of such board to carry on the business of banking," "may loan money," "choose one of their own number president, appoint a cashier, and such other officers and agents as their business may require," &c. The persons who signed the certificate were only associates and not directors. They chose a president of the bank, but they had no legal power to do so; but they had the power to choose a board of directors, and under the direction of the board to do banking business, loan money, and "choose one of their own number to be president," and to appoint a cashier, and other officers. But this bank never had a board of directors or other officer legally chosen; it was conducted entirely, from its commencement to its failure, by Charles Sanford, the owner and appointed president of the same, precisely as if he had started it as an individual bank of his own. But through the instrumentality of the seven citizens of the state who signed the certificate with him, he was enabled to commit a fraud upon the statute, and use it for individual purposes, when it was only intended to be used by at least seven *bona fide* citizens and holders of stock.

Under this state of things, a question has been raised as to the character in which the court should hold these seven persons.

It was insisted on the argument, that they must be considered as "directors or managers," within the intent and meaning of the "act to prevent frauds by incorporated companies," (*Nix. Dig.* 371, § 2,*) and so as to charge them in that character; but I do not so consider them. As there never were any directors chosen, they could, of course, not be directors, and as they never paid any money to the bank

---

* This section not re-enacted in the "act concerning corporations," approved April 7th, 1875.

for their stock, and had no interest in the company, and took no part in its management, nor had a right to do so, they, of course, cannot be charged as managers. They can only be considered as, what in fact they are, associates, and stockholders to the amount of stock subscribed by them, for the purpose of organizing a bank under the statute, with the simple power to choose a board of directors, on whom would devolve the power and duty and responsibility of exercising the banking power under the statute.

But the bank, after a short existence under the sole management of Mr. Sanford, became insolvent, with debts largely exceeding its assets; and the creditors insist that the bank, having called in but one third of its capital, the stockholders are bound to pay so much on their stock, not exceeding in all the fifty dollars a share, as will be sufficient, with the assets in hand, to liquidate the debts of the bank. There is no doubt of the correctness of this principle with regard to *bona fide* stockholders, and if the directors neglect or refuse to assess the stockholders, even of an insolvent incorporation, to effectuate that object, a court of equity will make an order for such assessment, and to carry the same into effect as far as possible.

The evidence in the case shows, that shortly after the bank failed Sanford died insolvent, and as he held in his own name two thousand nine hundred and sixty-five shares, there remained but thirty-five shares held by the seven other associates, each subscribing five shares. But the question is asked, are they *bona fide* stockholders, having never paid anything for their shares, Sanford himself paying all, and they merely lending him their names and subscribing his certificate, to enable him to go on with his bank? Will a court of equity consider them such? But how, indeed, can a court of equity consider them anything else but *bona fide* stockholders and associates? They are respectable and intelligent business men, and knew that the law required not less than seven citizens of the state (Mr. Sanford had but recently come into the state; whether a citizen of the state

at the time does not appear,) to organize a bank, and they, without deception, and in full knowledge of their responsibility, placed their *bona fide* signatures to the certificate for five shares of stock each. The law and the State Treasurer considered and treated them as *bona fide* stockholders; and in that character only, they were the means of starting the bank, which has done the evil we are now trying in some measure to adjust. How, then, can a court of equity treat them in any other character than such as they have, under their own signatures, represented themselves, for the purpose of carrying into effect an important act of the legislature? It is not supposed that any of these gentlemen imagined that evil would grow out of their proceedings, but they took the responsibility, and they must abide by their acts. The court cannot relieve them from the well settled and salutary rule relating to stockholders of an insolvent corporation. The enforcement of the rule in a case of this kind, will be right in itself, and salutary to the public. Good men too easily lend the use of their names for directors or other officers of incorporations, or what purport to be benevolent institutions, at the solicitation of those who demand merely the use and influence of the name, and not the official action of the person ; and it is quite time that honest men understand that courts cannot relieve from the responsibility thus voluntarily as sumed. *Angell & Ames on Corporations, ch.* 17, *sections* 599 *to* 602, and the cases referred to.

The legislature have settled this matter in the "act concerning corporations." In section .five, it is provided that "where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy the claims of its creditors, each stockholder shall be bound to pay, on each share held by him, the sum necessary to complete the amount of each share, as fixed by the charter of the company, or such proportion of that sum as shall be required to satisfy the debts of the company." *Nix. Dig.* 151.*

The second section of the "act to prevent frauds by incorporated companies," (*Nix. Dig.* 371,†) provides that "when-

---

* *Rev., p.* 178, *sec.* 5.   † *See note, p.* 166.

Kinsela's Administrator *v.* The Cataract City Bank.

ever any such incorporated company shall become insolvent, or shall suspend the ordinary business of the said company for want of funds to carry on the same, it shall not be lawful for the directors or managers of the said company, or for any officer or agent of the said company, to sell, convey, assign, or transfer, any of the estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements, of the said company; *provided always*, that in case of a *bona fide* purchase, made for a valuable consideration, before the said company shall have actually suspended the ordinary business of the said company as aforesaid, by any person having no knowledge, information, or notice of the insolvency of the said company, such purchase shall not be invalidated or impeached." The object of this section is to prevent preferences, and to secure an equal distribution of the assets.    1 *Stockt.* 457; 2 *Stockt.* 13.

In order to evade a sale or transfer under this section, it must appear, first, that the incorporated company had become insolvent; and this court has determined that a bank without funds for the redemption of its notes, and depending on individual resources and exertions to provide funds, rather than upon the immediate ability of the institution itself, is insolvent within the act; or, second, that it had suspended the ordinary business of the company, for want of funds to carry on the same.

In either of these cases, the company and its officers are prevented from selling or transferring any of its property or assets; and such sale or transfer is null and void against the creditors, unless the sale was a *bona fide* purchase or transfer for a valuable consideration, before the company had actually suspended its ordinary business, by a person having "no knowledge, information, or notice" of the insolvency of the company, or of the sale being in contemplation of its insolvency.

The first case I shall consider under the objection arising on this section of the act, is the transfer of property and assets of the company to Philip Rafferty, to the amount of

$7005.40, by Mr. Sanford, about the time of suspension, in payment of that amount due him from the bank. Mr. Rafferty was very fully examined before the master on this point of the case, and he states that on Friday, the 23d of November, Mr. Sanford called on him and wanted to borrow of him for the bank $5000; said the bank could get along with that. He offered to the witness the bank pocket-book of collaterals to select from, as security; it contained a part of the bills which he afterwards took. Sanford said the bank was perfectly solvent, and he would protect the witness at all hazards. He said there was $35,000 paid in, and only $3000 or $3500 tied up by judgments; but stocks were going down, and the bills were coming in, and he wanted $2000 that day to square up with the Paterson Bank. Witness then let Sanford have that amount, and Sanford offered to secure him with collaterals, which witness did not then take, he being perfectly satisfied that the bank was sound, and he offered and arranged to go with the president to Jersey City, and try and raise a loan. Sanford knew the money was held by Rafferty, as treasurer of Paterson. Witness refused the collaterals, and told him to take them to Jersey City to raise the loan; on the next day, Saturday, November 24th, Rafferty went to Jersey City to raise a loan, with Sommers, the cashier. Sanford could not go. They went to the Mechanics and Traders Bank, in which Rafferty was a director, but Mr. Fox (the president or cashier) declined to loan on account of the stringency of the times. Sommers had with him, and offered as security, the collaterals of the bank. Rafferty offered himself to become security for the loan; not being able to effect it, he let Sommers have for the bank, as a temporary loan, $3500. He knew the money was that of the city of Paterson, in his (Rafferty's) hands, as treasurer. The collaterals were again offered to him, which he declined, as he expected a loan would be effected with the collaterals, and then a settlement would be made with him. He called at the bank three times afterwards to have the settlement, but did not meet with Sanford; when he called on the 29th,

Sommers said Sanford had gone to Trenton. Rafferty wanted Sommers to fix up the settlement or account. Sommers said he had better see the president. On Friday night, the 30th of November, he went to see Sanford at his residence, a mile out of town, not being able to meet him during the day, owing to absence of one or both of them. He, Sandford, was not at home, and witness left word for him to meet him at the bank early next morning, as he had to go out of town. He met him at seven o'clock next morning, at the bank; it was not yet open, but Sommers went in with him at the side door, and got the collaterals and gave them to Rafferty, all of which he afterwards collected, except a note of $335, which was assigned to Paterson city. Sanford was present and agreed to the transfer. He kept his accounts as treasurer in the Cataract Bank; his private account in the Mechanics and Traders Bank at Jersey City. It was on Saturday, the 1st day of December, Rafferty received the collaterals, amounting to $7005.40. Sanford told him he had better take the bills (collaterals), and he could get them discounted. When at Jersey City, on the 30th, he was told that the Cataract Bank was but a one man bank, and no directors; and the same night Hoxsey told him to settle that night, and take anything he could get. He was a little scared, and determined to have a settlement. He received of the bank $7005.40 only, within a few cents certainly of that amount, being the amount of his temporary loans, and his balance in the bank, for all which the collaterals had been previously offered.

The statute says (section 2,) "whenever any such incorporated company shall have become insolvent, *or* shall suspend the ordinary business of said company for want of funds," &c., it shall not be lawful to sell or transfer, &c., its property or choses in action. Now the transfer of the securities to Mr. Rafferty was on Saturday morning, December 1st, and the bank did not suspend its ordinary business, and close its doors, till Monday, the 3d; consequently, no unlawful transfer to him can be alleged on the ground of the actual suspension of the bank, and the present case must rest entirely on the ground

that the institution was insolvent, and there is now no doubt of that fact. Rafferty says it was insolvent on the 23d of November, as he learned after he became receiver. Yet, if Mr. Rafferty stands in the character of a "*bona fide* purchaser for valuable consideration, without knowledge, information, or notice, of the insolvency of said company," his transfer or purchase being prior to the suspension, the statute says, "such purchase shall not be invalidated or impeached." No question has been raised as to this transfer being for a valuable consideration; indeed, the evidence abundantly shows that the bank, under very peculiar circumstances, was indebted to the full amount of all that he received. Nor is there any question as to the *bona fides* of the transaction, unless that be affected by previous knowledge or notice.

Had, then, Mr. Rafferty such previous "knowledge, information, or notice, of the insolvency of the said company," as to render the transfer to him illegal and void? Notice of an unregistered mortgage gives it priority to a subsequent registered mortgage or purchase. And it has been held, in cases of this character, that whatever is sufficient to put a person on inquiry is good notice; thus, if a man knows the legal estate or the possession is in another than the vendor, it will be sufficient to put the party on inquiry as to the character of that estate or possession, and to charge him with the knowledge thereof. *Freeman's Chan. Cas.* 137, and numerous cases collected in the notes to *Le Neve* v. *Le Neve*, 2 *White & Tudor's Eq. Cas.* [34.]

But the knowledge of the solvency or insolvency of a bank cannot depend on mere constructive notice, or what will put the party on inquiry. The statute says, "no knowledge, information, or notice," of the insolvency. The first term refers to actual self-knowledge; the second to the knowledge imparted to him; and the third to that which he acquires from notice, formal or otherwise. But each term implies knowledge, not mere suspicion, supposition, or belief, which any one may have himself, or have imparted to him. The counsel for the petitioners has urged with some force, that Mr.

Rafferty, being a director of the bank, or manager of the association, is chargeable with notice of the insolvency of the bank. This would ordinarily be the case, if Mr. Rafferty was either a director or manager; but we have already decided that there were no directors, and that he was not a manager, but a mere corporator or associate, or nominal stockholder. Had he, then, such knowledge as the statute requires to invalidate the act? He seems to have known very little of the bank. He did not even keep his private accounts in it, though, pursuant to a resolution of the city council, he kept his treasurer's account there. He had full confidence in Sanford, the president, and Sommers, the cashier, and they would seem to have been the only persons who knew, or who could know, the condition of the bank, or give any accurate information respecting it. And, as far as appears from the evidence, all his assurances from them were that the bank was solvent. Sanford told him that it was; that $35,000 had been paid in, and only $3000 or $3500 tied up with judgments. He, himself, had great confidence in the bank, and in its solvency; for, although the funds he had were funds of the city treasury, which were soon needed, and of which he must give a strict account, he hesitated not to make the temporary loans of $2000 and $3500, refusing all collateral security, leaving that to be used to obtain a more permanent loan than his.

Rafferty's confidence in the bank and in Sanford, does not appear to have abated until Friday, the 30th of November, when he was told at Jersey City it was a "one man bank," without directors, and in the evening of the same day, when he was urged by Hoxsey to have a settlement that night, and take what he could get. Then he says he "got a little scared," "got in his mind that Sanford had deceived him," and, not having been able to see Sanford for several days, he went to his house the same evening to see him, and he being absent, made the appointment to meet him next morning, which he did, and received the bills and collaterals.

So far as I can learn, he had, up to the time of his receiving the collaterals, no knowledge, information, or notice, of

the insolvency of the bank. It is manifest he had no knowledge of his own, and so far as the evidence goes, neither knowledge nor notice was imparted to him; for the person who talked with him at Jersey City, and Mr. Hoxsey, had no knowledge to impart. They told him of their suspicions or fears, and these he may have had himself. But mere suspicions or fears constitute neither knowledge nor notice, although they may have influenced him to urge a speedy settlement. Independent of the question of notice, Mr. Rafferty had some claims on these collaterals. They were offered to him on the 23d of November, when he made the temporary loan of $2000, and again on the 24th, when he added to that loan, $3500. But he declined to take them, preferring that the bank should retain them to enable it to make a more permanent loan, and settle with him for his temporary accommodation and the prior balance, as promised. When the bank failed to secure that loan, and was unable to repay Rafferty, he had at least an equitable claim on the securities, and to be placed in as good a situation as to security, as a more permanent loan would have been placed. Besides the pre-existing debt constituted a valuable and *bona fide* consideration for the transfer of the bills and notes. 16 *Peters* 1; *Story on Prom. Notes* 195; 1 *Zab.* 665.

Under these considerations, I feel entirely satisfied that the receiver should not be held accountable for the $7005.40 paid to him in collaterals.

There are some other cases where the bills and securities of the bank were transferred to its debtors about the time of, or shortly before, its stoppage. On Saturday, the 1st of December, James Dunn, the complainant in the bill in this cause, had his account reduced from $3500 to $3000 by the receipt of bills or money; but this was before the bank stopped payment, and Mr. Dunn seems not then to have had any notice or knowledge of its insolvency, though he had some fears, and was anxious about his deposit; but this did not affect the payment or transfer to him. He states in his evidence, however, that on Monday, about three o'clock, he received from the

bank, on his deposit, assets to the amount of $500, in addition to the $500 received on Saturday.

An objection is also taken to an allowance of a payment by the bank of $376.50, to A. A. Hopper.

A short time before the bank failed, some of its friends made an effort to raise a loan for the bank, to relieve it from the pressure and stringency of the money market. A certain sum was to be raised by contribution. S. Pope agreed to contribute to the loan, if successful, $376.50, and he placed that sum in the hands of A. A. Hopper to hold until the loan was completed, and he put it in the bank as a special deposit. The loan was not completed, and after the assets of the bank came into the hands of the receiver, he, on application, paid the money over to Mr. Hopper for Mr. Pope, as property not belonging to the bank, and I think the payment was right and legal.

Exceptions are also taken to a payment of $1016.49 by the bank to J. S. Huntoon, on the 1st of December, as appears by the books of the bank. But Mr. Huntoon, on the 3d of December, swears to the complainant's bill, that "the statements of his actings and doings, and of his connection with said Sanford, and of *his deposit balance* in said bank, &c., are true."

The bill states that "said Huntoon had a deposit in said bank of about nineteen hundred dollars." But deducting this payment of $1016.49 from Mr. Huntoon's account, it leaves a balance of $946.25, which is all he claims of the bank. Hence, it is inferred that the payment could not have been made until after the bill was sworn to, on the 3d of December, which was about the time, or after it, that the bank had closed its doors and stopped payment, and if so, Mr. Huntoon, according to his affidavit, may have had notice or knowledge thereof. Still the entry of payment is on the 1st day of December, before the bank was closed.

I shall, therefore, report that the receiver exercises the powers conferred on him by this court and the statute, and ascertain whether the said payment was made after the bank

closed, or after Mr. Huntoon had knowledge, information, or notice, of its insolvency; and if so, that he proceed to adjust or collect the same, if it be practicable to do so. And I shall make the same report in respect to the alleged payment to John Cassedy for the Jersey City Bank, on the 3d of December, of $3000; and also in regard to payments alleged to have been made to James Dunn, and to Towle and Van Dyke, after the stoppage of the said bank, or after they had knowledge, information, or notice, of its insolvency. Sanders and Sommers are alleged also to have received pretty large sums after the known insolvency, or failure and stoppage of the bank, but the evidence shows that they have both died insolvent. And as to any other persons of whom there is evidence of having received money or assets of the bank, on account of payments for money due them, with knowledge, information, or notice of the stoppage of the bank, or of its insolvency, at the time of such payment, the same report will be made for the receiver as in the previous cases.

In regard to Beach, the exchange broker of the bank in New York, who stands on the books of the bank a debtor for $33,955.18, judgments were obtained against him, and nothing realized; and the counsel in the suits informed the receiver that nothing could be recovered, and nothing was or could be realized from the debt of $35,000 against Sanford, the president.

No settlement has been made with the treasurer in regard to the bonds and securities deposited with him for the redemption of the notes of the bank, but when the limitation has expired, it will be the duty of the receiver to collect any overplus that may remain with the treasurer.

There are some minor exceptions as to small accounts, discrepancies in the books of account, and moneys paid for small expenses or counsel fees, of which it is only necessary to say, that they have not been sustained by the proof, or are considered invalid.

The question of interest, if any, and all other matters may be referred to the final account of the receiver.

Kinsela's Administrator *v.* The Cataract City Bank.

Whatever objections might have been raised to the appointment of Mr. Rafferty as receiver, there appears to be no substantial reason why he should be removed.

The receiver will proceed, therefore, to settle up the business, and to make his final report, as soon as circumstance will permit.